This on calendar for argument is Cooper v. Dignity Health. Counsel for appellate, please proceed. Thank you, Your Honor, and may it please the court. My name is Chad Conley. I represent Heather Cooper. I'd like to reserve two minutes for rebuttal, please. All right. Ms. Cooper was unlawfully terminated by Dignity Health for excessive tardiness after she informed Dignity of her disability and requested a morning time accommodation, which was denied, and after Ms. Cooper informed Dignity that she had filed an EEOC charge of discrimination. The district court erred in granting summary judgment against Ms. Cooper on her ADA discrimination and retaliation claims, and we request reversal for three primary reasons. First, issues of fact exist on whether strict compliance with the hospital's clock-in time policy was an essential job function for techs in her department while she worked there. Second. Can I ask a question about that? I know you have other arguments here, but didn't she concede that it was an essential function? No, she did not. Well, I mean, her testimony seems to suggest that, and I'm wondering, I mean, my bigger question was, is that enough? Like, can a plaintiff in a case like this concede away the essential function? I mean, she testified that an essential part of her duty was showing up and being ready for surgery at 7.30 a.m. That's correct, Your Honor, and those, respectfully, are two different things. Okay, tell me why they're two different things. Absolutely. Dignity claims that the essential function here is literally taking your badge and swiping it. That's it. What Ms. Cooper testified... That seems a pretty narrow view of their position. I mean, their position seems to be, you've got to be ready and for our patients at 7.30, and that doesn't strike me as an outlandish position. I agree with you. Ms. Cooper does not dispute that, Your Honor, the true essential function of the job was exactly what you just said, to be surgery ready at 7.30, and she always was, always. No, that's not true. The record shows twice they went looking for her, and there's certainly other people who fudge this time policy repeatedly, but I didn't see anybody else where they had to go looking. You know, they were always ready to go. Is that right, that there are two instances? I don't agree with that, Your Honor, respectfully. The one instance they bring up that they tried to tie to that is when Ms. Coates, the manager, claims that she was called because they couldn't find Ms. Cooper in the surgery room. However, in her deposition, Ms. Coates testified to a few very important things. Number one, it had absolutely nothing to do with her clocking time. Number two, Ms. Cooper was in her room by 7.30 ready to go. What had happened was, she went in her room, she was ready to go, and sometimes, frankly, people have to step out, go to the bathroom, those types of things. And so the point is, this was not an issue that had anything to do with clocking in after 7. So wait a minute, Counsel, you seem to be sidestepping, so it was a testimony that she was there in the OR, when you say in her room, you mean in the OR room where she was assigned, I take it? Yes, by 7.30. And stepped out, and they had to go looking for her, and then, is that it? And she came back, and Ms. Cooper- But it's undisputed that they had to go looking for her, which is inconsistent with the notion that she was always ready at 7.30. Respectfully, I disagree, Your Honor. Number one, there is no evidence whatsoever about why she stepped out of the room briefly. There doesn't have to be evidence about why she stepped out. The issue is, was she there and ready to go when the surgery was beginning? So it doesn't matter why she stepped out. The point is, she was not there at the time she was supposed to be. Well, if I may, Your Honor, I don't completely agree with that, because Ms. Coates testified that, again, the critical, essential duty here was to be surgery-ready in your room at 7.30. Ms. Coates testified she was. Ms. Coates testified- Hold on. Let's get back. So she was asking, whether she was or she wasn't, she wasn't always late at coming in at 7.15. So sometimes, she could have fudged that a little bit. But she's asking, her accommodation is, I want to show up at 7.15 a.m., right? Do you agree with that? 7.10 to 7.15, clock in. Correct. Okay. And then she testifies that it takes her 20 minutes to 30 minutes to get ready for surgery. So it just seems to me to be logically impossible that her accommodation, even given her own testimony, would allow her to be ready by 7.30. Because you can't give the accommodation to check in at 7.15, take a half an hour to get ready for surgery, or even 20 minutes to get ready for surgery, and be ready by 7.30. Understand, but respectfully, your honor, that misstates the evidence, and the district court misstated the evidence. Okay, tell me why that misstates the evidence, then. The Dignity Health argued that it would take 30 minutes or more, but that's incorrect. No. Cooper said- Oh, go ahead. Oh, no. Please, please. Well, Cooper said, for more than complicated procedures, the IONM patient setup would usually take me 20 and 30 minutes. Okay. Am I misreading that? Yes, your honor. I thought that was her testimony. Yes, your honor. That is different. And there was- It was different. Was it? Sure. We need to be clear about what happens here. They have to be- No, we want to be clear about what her testimony was. Sure. And I appreciate that. What her testimony is, is that it would take her about 15 minutes to get ready. Sometimes even less time. The patient setup- Wait, where did she say that? Because I'm reading from ER 210, where she said, for more complicated procedures, the IONM patient setup would usually take me 20 and 30 minutes. Your honor- And it's on ER 210. Your honor- So where are you getting that it's 15 minutes or less? Well, a couple things. That's not what she's talking about in that testimony, your honor. She's talking about once they're in the room and the patient comes, then they have to take their electrodes and do different things to get the patient ready. That's not pre-730. There are multiple stages in what they do. The pre-730 tasks, your honor- It's called the setup. It's called the setup. And that's what she was talking about in her testimony, the setup. She talked about two things, and maybe the term of art would help us understand. So she's got, there's initial pre-patient tasks by 730, and then is setup a different thing that after the patient shows up? Correct. May I explain just very briefly what happens? Sure. Sure. Because- They get there. They get there. They have a cart. Ms. Cooper testified. She testified to all of this. Gets her cart ready. They roll it into the room. That's it. Sometimes they meet with Mr. O'Rourke about some changes, but Ms. Cooper testified that rarely happened. They had so much time in the morning, in fact, that Ms. Cooper and other techs testified that they would go get coffee, get breakfast, socialize. There was very little to do pre-730. They go in. That's when the patient is rolled in. The surgery does not start anywhere near that time. The patient's brought in. She still does nothing. The nurse and the anesthesiologist has to intubate and sedate the patient. She testified that that takes 15 to 30 minutes. Then at that time is when she actually starts her patient setup, whereby she's taking these electrodes and things they put under the skin and then it attaches to her device to monitor. She testified she wouldn't even start doing that until eight or later. Then the doctor and nurses do more things to prepare the patient and generally the first cut, as what non-doctors would say, the surgery, would really start at 830 or 9. That's what actually happened here. So the key issue here is what was the essential function before 730? That's a very helpful explanation. I appreciate that because I want to make sure I keep these terms of art straight about the setup procedures. But when we talk about what is really essential, for part of the sequence of events, the time was 7 o'clock and of course in June it was moved back to 6.45. So regardless of when the hospital set the time to be there, because I don't think that matters, your position is that it wasn't essential to be there at the time they set. Because why? Because you think that she could get all of the procedures that she needed to do done prior to the start of surgery. Prior to 730. Why is it legitimate with so many moving parts and given this is such a sensitive position, so many different disciplines that have to come together for this surgery to happen, why isn't it appropriate and essential for the hospital to be able to say, whenever they say it, that 6.45, 9 o'clock in the morning, whenever it's going to be, that everybody has to be on deck and ready to go by a certain time. Why isn't that? So that they know if somebody doesn't show, they have time to accommodate. That seems very reasonable to me. So I want to give you a chance to respond to, it's not so much 6.45 or 7 o'clock, but their go time seems to me to be entirely reasonable. Absolutely your honor. And the case that the district court relied upon that this legal principle comes from that you're talking about is the Sanford case. That was the big case here, right? And this court should reverse and that would be consistent with Sanford because while I recognize that Sanford says that we are to defer to rational staffing judgments of a hospital for genuine necessities, that does not negate the Roar case and related cases that says that any employer can not just put something in a policy and say it's essential. It has to be rational and critically, the Sanford case expressly states that every case is different and it requires a fact specific individualized analysis. So do you have one case that talks about punctuality at a start time that's set by the employer is unreasonable as being an unreasonable request or work condition? Well the Humphrey case that we cited your honor deals with a start time that that is on point. It doesn't say it's not exactly on point to answer your question. That's not specifically about here's a case on whether this specific time is, but that has to do with. It's not the time. Whatever time the employer sets as the time that you start work. I would find it difficult to second guess that and say that's not an essential job function that would really wreak havoc with a lot of our precedent. If we started telling employers what time they can set as the start time for punctuality purposes. I agree your honor that at the outset, it's rational to look through a lens to give some deference to legitimate concerns when the employer says, look, here is why this particular start time is so critical. But again, employers are never allowed to have total deference. Sanford does not stand for the position that hospitals can do whatever you want, whatever they want. I would give you that, but this doesn't seem to be whatever they want. Like it seems pretty intuitive that you need to get ready for a brain surgery or a spinal surgery and so I don't know how far your argument goes there. I mean, if they'd said, yeah, you got to come in at 530, even though it only takes a half an hour to get ready by 730 and that's essential. That's one thing. But this just doesn't strike me as out of the realm of. In fact, they were saying seven and then they moved it back 15 minutes because there had been problems. So this is something that they were struggling and grappling with to get right. I may address that, your honor. When you say that there's evidence they were struggling with that, I somewhat agree, but also disagree. The evidence is that they allege that they were having trouble finding people in the morning. But Miss Cooper testified that after that change was made, absolutely nothing changed about her job and what she did. In addition, there is absolutely no evidence, your honors, that when these texts for years are clocking in after seven, that it actually had any impact whatsoever on teamwork or safety because I don't, I don't know that the record bears that out. The first line supervisor did say that there was chaos sometimes and that they had to go looking for people to fill in at times when at the 11th hour and that's what they were trying to avoid having to be in a scramble when they're getting ready for these very delicate surgeries. And if I'm one of the patients that's lying there waiting for my brain to be cut open, I don't want chaos, you know? So that's what he's saying that he wanted to avoid chaos and, and a mad scramble before they were going into these very delicate surgeries. And that seems reasonable to me for a hospital to want to have the maximum amount of, um, in a relationship and, and, and, um, working together so as to make these surgeries as successful as possible. I just don't see that that's unreasonable. I don't disagree that that goal is unreasonable. It's absolutely reasonable, but it doesn't, our discussion about the reasonableness, we does not mean there's no issues of fact, that's the issue here. The case law says that when there's differential discipline, that when you do not actually enforce your policy, that that is enough so that a jury can consider those very things that you brought up your honor and actually decide whether or not it truly is an essential function. There was sufficient evidence here to overcome summary judgment. That is for a jury to conclude. If I might, I'd like to ask a question so the council has a chance to think about it before he comes back for rebuttal. I want to make sure that I'm getting the record correct, sir. I've got that your client started in 2010, January of 2010, and then their first correction at corrective action in the second in October of 2011 and February of 2012, you know, late more than 70 times late, more than 40 times is what I have in my timeline that matters to me. And I'm trying to figure out there's a discrepancy that in September, 2012 was the first time she I think began taking prescription medications according to her declaration. But there's another record entry at SCR 103 in an email to leave administrator that where she said she began taking medication a year later, about a year later in February of 2013. So in other words, when you come back, if you could help me understand your theory about how the onset of her need to take this prescription medication should be viewed, given that I think her tardies significantly predate that onset, I'd just like to hear your when you come back. All right. Thank you. Thank you. We're here from Appley. Or maybe we won't hear depends on whether you can unmute yourself. Sorry, your honors. I apologize for the delay. Lindsay Fiori on behalf of Dignity Health. May it please the court. A few additional points to make about the essential function of the job argument, your honors. The Samper case is controlling. And while the case does say it is an individualized inquiry as to whether a function of a job is essential, the evidence that was presented by the defendant in the Samper case is remarkably similar to the evidence that Dignity Health presented in this case to show that punctuality was an essential function. And that includes a written attendance and punctuality policy, a job, an annual performance evaluation that included as a requirement adherence to the attendance policy, the written discipline that Ms. Cooper received on multiple occasions explaining to her in detail why it was important for her to be at work on time and how her habitual tardiness affected her department. There's also testimony from her supervisor, her manager, even some of her colleagues. Counsel, can I interrupt? Yes. Can I interrupt? Because we know all that. And if that were, that would be an easy case. What you're describing would be a very easy case. Your case is a little bit harder because what he's got on his side, right, opposing counsel has a whole lot of other examples of other folks being very, very, very tardy, really excessive. And this is a, this is a policy that went pretty well unenforced it seems for a very long time. So what's your response to that, please? Sure. Your Honor. I have a couple of responses to that. Factually speaking, there is evidence of four different employees who did receive discipline for violating the tardy, the attendance and punctuality policy specifically for tardies. Was that before June 2013 or after June 2013 or both? Both. Your Honor. Shea Petillo is an individual who was disciplined for tardiness close to the time that Ms. Cooper was, that was early 2013. There are three other individuals who were disciplined for tardiness via verbal warning or written warning or both following the June 28th, 2013 meeting. I understand that Ms. Cooper has raised a dispute as to whether that discipline actually occurred after June 28th or not. I don't believe it's a genuine dispute, Your Honor. There's testimony from all three of those individuals that they believed that the discipline occurred after that meeting. One of those individuals testified that in his disciplinary meeting, the June 28th meeting was specifically referenced. Ms. Coates, the manager submitted a declaration that she recalls giving discipline to each of those individuals following the June 28th meeting. I think the time period is important here, Your Honor, because there's testimony in the record, evidence in the record that 2013 was sort of a unique time. At that point, the organization was extremely busy. There were two openings for IONM techs for Ms. Cooper's position at that time. And all the surgeries, there were 14, 15 surgeries a day starting at the same time, all the rooms were full. Mr. Aroe testified that that was a particularly difficult and busy time. And given all of the struggles they were having in the morning in 2013, that's when the decision was made to change the start time, to give everybody more time, to deal with the time constraints that he was feeling. To a certain degree, to a certain degree, the change in the start time doesn't really matter here. I mean, the real question is, could the hospital accommodate the 7.15 late start time and still have her ready, and she could still be ready by 7.30? Can you address this testimony at page ER 210, and whether that's accurate, that this is the 20 to 30 minute prep time, is that actually talking about something that occurs after 7.30? Give me just a moment, Your Honor. I'm going to pull that testimony. Here's what I would have to say, Your Honor, actually. I know what you're referring to. Ms. Cooper is considering her position in a vacuum. She's saying, I personally could come to work and complete all of these pre-7.30 tasks in 15 minutes. What she's ignoring is all of the other- Did she say that? Hold on. That's the question. Yeah, I didn't read her saying that, because if she said that... I mean, what I read her testimony to be was, yeah, a lot of times I could get it done in 15 minutes. But yeah, sometimes, especially on these difficult tasks, it would take 20 to 30 minutes. So could you go to page 210 and answer the question regarding what that testimony is referencing? Is it referencing pre-7.30 preparations, or is it referencing post-7.30 preparations when the patient is there? That's a very important point. Exactly. That's it. What I will say, Your Honor, is Ms. Cooper's testimony is that there were two different sets of tasks. I don't believe that her testimony is really consistent with the testimony of other people who have- Counsel? That wasn't the question. Judge Longson, and now there's three of us asking a very specific question. The testimony on page- 210. Yeah. Is that about after the patient gets there or before the patient gets there, please? Thank you, Judge Longson. Thank you, Judge Nelson. Team effort sometimes. We're just trying to understand that testimony. I understand that, Your Honor. And I'm trying to answer your question because these are the words of someone else. And I'm trying to understand the context. You're the attorney for the hospital, so- Absolutely. You're the attorney for the hospital, so we're asking you, from the hospital's perspective, you know how the procedures work. So this testimony, is it referring to the pre-730 time period when the patient is not in the operating room? Or does this refer to the time after the patient comes and you're doing the pre-op procedures with the patient? It's unclear. And so that's why it's very important whether this time period addresses the pre-patient entering the operating room because then the 15 minutes would not be enough for her to perform. But if it's post-patient present, then the 15 minutes may be enough to meet the punctuality essential function prong. I'm reading this again, Your Honor. I don't know that I can answer that question for you. Well, if you can't, just let us know you can't. Well, and if you can't, then help us with what the testimony in the record is about why it would take more than 20 minutes. Because that was the impression I had coming into this case that's been called a little bit into question. And so, I mean, it seems to me the other fact that might be in the hospital's favor is that there was another employee who had child care issues and was asking to come in at 720. They granted a two-week trial period to do that, and everybody agreed that's not working. So that suggests that a consistent 720 start time wouldn't work. What about a consistent 715 start time? What's the testimony that that wouldn't work? The testimony that that wouldn't work comes from her manager and her supervisor. Because, and to the extent that Ms. Cooper's testimony on page 210 of the excerpts of record is saying she could do her pre-patient present tasks in 15 minutes, the post-patient tasks are done afterwards, that's what her testimony appears to be saying to me. And to answer your question, that's how I read her testimony on that page. Well, if that's the case, wait, hold it. If that's the case, why can't she, and just to play devil's advocate, why can't she get there at 715, arrive at the hospital at 715, complete her 15-minute tasks in the OR, and be ready to go for the patient? There's a few answers to that question, Your Honor. The first is, the testimony on page 210 is not necessarily consistent with her deposition testimony in which she admitted that there were times that there would be add-on surgeries, that the schedule would change, that she would need to go talk to the physician about the orders, that the orders from the physician would change, that she would need to help cover for another tech because that person was unexpectedly out. There's more than just doing these specific tasks specific to her job before surgery starts. But where is the testimony that that would take more than 15 minutes? I mean, if you're right, and I give you that if there's changes and they've got to be there and adjusted to it, but can you point us to the record that says that? Because you seem to sort of conceive that ER 210 doesn't support the position that I came in thinking that it did. Your Honor, the best I can answer that question is this. She's testifying on page 210 about her own pre-patient present tasks. She's not considering the other functionality of the department. She's not considering other things that might happen. So what's the testimony on that? Because here's one, I mean, I'm just trying to think through this. And one thought I had was like, look, they built in a little bit of fungibility. So like maybe they have 15 employees coming. They have to have 10 that are there ready. And she's basically asking to be the one exception every time. But I mean, I think I might be speculating there. And so what I'd like to know is what's the what's the record basis to say that you need all employees that 15 minutes would not be enough to get ready. I'm going to find that for you, Your Honor. Give me a moment here. I don't. OK. At excerpt of record 393, 392 and 393 is dignity health statement of fact. This may be the most this may be a roundabout way, but it's our statement of fact on summary judgment that combines the testimony of Miss Cooper herself, her supervisor and her manager, talking about these various other things that could occur in the morning with those deposition sites. And so Miss Cooper's testimony. Give me a moment here, Your Honor. On page 68 of the supplemental excerpts of record. Miss Cooper talks about that. There were times where there were new cases that weren't assigned the day before and that they would need to be assigned the following morning. That's one example of that. Quickly, something that's different than the than the limited tasks that she says she can perform in 15 minutes. Well, what we don't know is whether that having a different patient assigned is going to impact her set up time. So we're trying to connect the dots there. Your Honor, I don't see how it possibly couldn't. I mean, she's doing one set up for one patient. According to her, she can do it in 15 minutes if she has to do another one. How could she possibly do that in 15 minutes? That's a lot. So we don't we don't counsel. That's a lot of ifs. That's what we're trying to figure out. Can I ask a somewhat related, maybe a somewhat unrelated question? When they went from 7 o'clock to 645, I think the record is that they wiped everybody's slate clean except one, except Miss Cooper's. That's not a helpful fact for the hospital. Do you want a chance to respond to that?  And I appreciate the question. That's Miss Cooper's testimony. The record belies that. What what happened was everyone's party count was set to zero. That happened for Miss Cooper also. Can you give me the ER site where I can where I can see that that happened for Miss Cooper? That'd be helpful. Absolutely. I can, Your Honor. It's excerpts of record 506 to 510. Those are the written warnings that she received following the June 28th meeting that talk about her sixth, seventh and eighth parties. In other words, her party count was reset to zero along with everyone else's in that June 28th meeting. And just to make another point very quickly, Your Honors, about something that Miss Cooper's counsel referenced at the during the beginning of the argument. Miss Cooper's claimed that the case law supports the idea that if there's differential levels of discipline, that this somehow undermines the essential function of a position. I'm not aware of any case law that actually holds that. And I don't believe that Miss Cooper presented any. The case law that she presented was instances where employers allowed some employees to be completely exempt from an essential function while requiring other employees to do it. That's not the case here. There isn't evidence. But if they allowed everyone to come in at 715 and never took any action, wouldn't that undermine the position that it's an essential function at least to be there by six or 715 to be ready by 730? Your Honor, I think the relevant time period here is June 28th and on the relevant time period. According to even the cases that Miss Cooper has cited in her reply brief is what was the essential function of the position at the time the adverse action was taken. The adverse actions here asserted by Miss Cooper are being placed on leave and being terminated. Those all occurred after the June 28th meeting when it was clear. I don't think Miss Cooper was the major violator after June 28th. She was in a close race for first to be sure, but I think there was actually one person who had one more tardy than she did after June. Your Honor, very briefly, the record shows that Miss Cooper was actually tardy 11 times. That's on pages 473 to 476 of the excerpt of record, which is the same number asserted by her as the other comparator that had the same amount. But Miss Cooper also had a significant history prior to the disclosure of any disability or engagement in protected activity. I know, counsel, but that's one of my problems. That's one of my problems and so I've got a question for opposing counsel. You're either starting over in June or you're not. I think you're saying we did and we set her at zero and you want me to infer from ER 506 that she got set back to zero also. So what's your position? Did that prior history count or not? The prior history didn't count in terms of accumulating her tardies. I would say I'm certain it had some impact on the considerations to terminate her employment, particularly with the end of her employment when she started lying about when she had actually come to work. That's a related question. I think it looks like Judge Nelson and I have the same question about that. From the documentation, I think she's fired for tardies and the stated reason is that, not for dishonesty. Did I anticipate your question correctly? So isn't that right? I'm not sure you get this other evidence wrapped in here. If I may, Your Honor, if you look at excerpts of record 423 and supplemental excerpts of record 182 to 183, that is the testimony of Rhonda Coates and Jenny Musagabe, which was the manager and the HR person, talking about the things that they looked at and considered when deciding to terminate Ms. Cooper's employment. And it included the fact that she had not been honest about what time she was coming into work. Well, this is testimony I take after the fact, but the documentation at the time said she was fired for tardies. The documentation says what it says, absolutely, Your Honor. But there's testimony about what the conversations entailed and what led to the decision. And if I may, Your Honor, I know I'm over my time, if I can make one more point about the other individuals who had tardies after June 28th. What we don't have in the record is any explanation or knowledge as to whether some of those late arrivals were permitted, were excused. That's not in the record. And all of those individuals, and Ms. Cooper herself even testified that there could be times when an employee comes in late and it is excused. Particularly, Mark Housman in his deposition explained that sometimes they would get a call that there was low census and they weren't needed. And then they would get another call saying, actually, you know what, we had an add-on surgery and now we need you to come in. And so in those cases, a late clock-in would not necessarily be a tardy. That is in distinction to Ms. Cooper's testimony where she admitted she was late for an unexcused reason every single date between June 28th and the end of her employment. All right. Thank you, Counsel. Thank you, Your Honor. Rebuttal. Thank you, Your Honor. A lot of nuances to these facts clearly. And these back and forths about what's reasonable and what could be seen and if this and at that, just further exemplify that there are issues of fact. We need a jury here to conclude those things. Your Honor, I'd like to circle back with your question. You asked me a specific question about the fact that she had tardies and was disciplined prior to the time that she testified that she started her medications and were having problems, correct? And you'd like me to address that? That and then there's a discrepancy about when she started her medications. Okay. What I have is she testified she started her medications in September 2012 is what she testified to. Right. And then there's a document that she submitted that puts it about a year later. Do you have the ER number for me, Your Honor? I didn't catch that. I do. Go ahead and I'll pull it out for you, but go ahead and respond to the second part of the question. I'll get it for you. Okay. Thank you very much. So she started, yes, she had received discipline before that time. The evidence on the record as to why she did that goes back to the Coates issue that we talked about previously quite a bit that the time when Coates went in after 730 where Heather had already been set up ready to go. And the testimony is because of that issue, Ms. Coates went back to her office and decided to look into Ms. Cooper's time. That's what spurred her starting to focus in on Ms. Cooper. Now, certainly we don't we don't claim that was discriminatory. Of course not. Because she had not yet, to your point, brought that to their attention. However, once I'm sorry to interrupt, but to me, the critical issue is whether or not she would she needed an accommodation because of her disability. If she if she was seeking to come in, if she was tardy before her disability, a reasonable inference is it's not the disability that necessitated the late clock. Excuse me. So so that's that is indeed what I'm trying to get at. So she started in 2010 and employment there. October 2011 and February of 2012. She was getting reprimands for a very significant dozens and dozens of tardies, as you know. And then the final point is that it's in September 2012. This is ER 11. That's what you're referring to. Her declaration says that that's when she started taking prescription medications. At S.E.R. 103, I think there's an email to the Aleve administrator where she said she began taking medication in February of 2013. So S.E.R. 2013. That timeline is difficult to reconcile with whether or not her I'm not questioning the legitimacy of her need to take this medication. It's just that it seems that there's a significant history of tardies that significantly predates the onset of the medication. That is correct. There is. I point out that that significant history of tardies. You have all the data was ubiquitous. Everyone was tardy. I mean, it was constant, Your Honor. It was not just her. That was what happened in that department. So to the point that how is it that she's tardy and she's clocking in after seven and now she has a problem in the morning? I think what you're getting at is, is that just a coincidence or is she using that as an excuse? And I understand that. But there is evidence and testimony and she got we produced doctor's notes and she told them about it. And it's her testimony that that is actually what was happening with her. So certainly it's a coincidence. I admit that the fact that she needed a morning time accommodation to deal with her medical issue overlaps with the fact that it was commonplace in that department for them to clock in after seven because they were still surgery ready by 730. She was always graded highly for patient safety, teamwork. If it really was compromising patient safety and teamwork, she would be skewered in those evaluations. But she was outstanding at her job. That's what all of the evidence suggests. If I may point out one other thing that Judge Nelson brought up. Respectfully, when you said that Ms. Patillo had been given the 720 accommodation and I believe what you said, Judge, was that clearly that just didn't work out. I want to be clear about something. The reason she was disciplined and it didn't work out is because she was clocking in much later than her already accommodated time. It wasn't that 720 doesn't work and we're getting rid of it. That is not the evidence, Your Honor. Respectfully, the evidence says she was abusing it and coming in even later. So had she actually been clocking in at 720, which they gave her again, that was less onerous. I'm sorry, Ms. Cooper's request was less onerous than that because they had to cover for her. But Mr. O'Rourke testified that they could, quote, manage it. So if they could manage it for her and cover, why couldn't they at least try to give Ms. Cooper a less onerous accommodation when she's just going to be coming in the same time she always had before and she was always ready to go? We understand your argument. Thank you for your argument. Thank you to both counsel for your helpful arguments. The case is argued and submitted for decision by the court.
judges: Rawlinson, Christen, R. Nelson